## **Exhibit A**

Bruce H. Nagel, Esq.
Jay J. Rice, Esq.
NAGEL RICE & MAZIE, LLP
103 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 618-0400

Marc E. Kasowitz, Esq.
Daniel R. Benson, Esq.
Michael J. Bowe, Esq.
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

ATTORNEYS FOR PLAINTIFFS

|  |  |
|---|---|
| FAIRFAX FINANCIAL HOLDINGS LIMITED, and CRUM & FORSTER HOLDINGS CORP., | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MORRIS COUNTY |
| Plaintiffs, | DOCKET NO. _____ |
| - against - | Civil Action |
| S.A.C. CAPITAL MANAGEMENT, LLC, S.A.C. CAPITAL ADVISORS, LLC, S.A.C. CAPITAL ASSOCIATES, LLC, S.A.C. HEALTHCO FUNDS, LLC, SIGMA CAPITAL MANAGEMENT, LLC, STEVEN A. COHEN, EXIS CAPITAL MANAGEMENT, INC., EXIS CAPITAL, LLC, EXIS DIFFERENTIAL PARTNERS, L.P., EXIS INTEGRATED PARTNERS, L.P., ADAM D. SENDER, SPYRO CONTOGOURIS, MAX BERNSTEIN, ANDREW HELLER, LONE PINE CAPITAL, LLC, LONE PINE MEMBERS, LLC, LONE PINE ASSOCIATES, LLC, ROCKER PARTNERS, L.P., COPPER RIVER PARTNERS, L.P., DAVID ROCKER, THIRD POINT LLC, DANIEL S. LOEB, JEFFREY PERRY, TRINITY CAPITAL OF JACKSONVILLE, INC., TRINITY FUND, LTD., MORGAN KEEGAN & COMPANY, INC., JOHN D. GWYNN, CHRISTOPHER BRETT LAWLESS, and DOES 1 THROUGH 50, | COMPLAINT AND JURY DEMAND |
| Defendants. |  |

Plaintiffs Fairfax Financial Holdings Limited ("Fairfax Holdings") and Crum & Forster Holdings Corp. ("C&F" and, together with Fairfax Holdings, "Fairfax" or "plaintiffs"), complaining against defendants S.A.C. Capital Management, LLC ("S.A.C. Capital Management"), S.A.C. Capital Advisors, LLC ("S.A.C. Capital Advisors"), S.A.C. Capital Associates, LLC ("S.A.C. Capital Associates"), S.A.C. Healthco Funds, LLC ("S.A.C. Healthco"), Sigma Capital Management, LLC ("Sigma"), Steven A. Cohen ("Cohen"), Exis Capital Management, Inc. ("Exis Capital Management"), Exis Capital, LLC ("Exis Capital"), Exis Differential Partners, L.P. ("Exis Differential"), Exis Integrated Partners, L.P. ("Exis Integrated"), Adam D. Sender ("Sender"), Spyro Contogouris ("Contogouris"), Max Bernstein ("Bernstein"), Andrew Heller ("Heller"), Lone Pine Capital LLC ("Lone Pine Capital"), Lone Pine Members LLC, Lone Pine Associates LLC, Rocker Partners, L.P. ("Rocker Partners"), Copper River Partners, L.P. ("Copper River"), David Rocker ("Rocker"), Third Point LLC ("Third Point"), Daniel S. Loeb ("Loeb"), Jeffrey Perry ("Perry"), Trinity Capital of Jacksonville, Inc. ("Trinity Capital"), Trinity Fund, Ltd. ("Trinity Fund"), Morgan Keegan & Company, Inc. ("Morgan Keegan"), John D. Gwynn ("Gwynn"), Christopher Brett Lawless ("Lawless"), and Does 1 through 50, say as follows:

## PRELIMINARY STATEMENT

1.      This action arises from a massive, illegal and continuing stock market manipulation scheme, which has targeted and severely harmed Fairfax, among other companies, and which has resulted in immense ill-gotten profits for S.A.C. Capital, Exis Capital, Lone Pine Capital, Third Point, Rocker Partners, Trinity Capital, and other extremely powerful hedge funds.

2

2.     This scheme involved:  defendants' preparation of a massive and fraudulent disinformation campaign attacking Fairfax and other targeted publicly-traded companies, including the preparation of ostensibly objective, but in fact biased, negative stock analyst reports; defendants' accumulation of short positions in the stock of those companies -- i.e., bets that the stock prices would decline; and defendants' subsequent unleashing of the disinformation campaign and biased analyst reports -- thus bringing about the sought-after stock price declines and resulting immense profits for the defendants.

3.     Defendant S.A.C. Capital Management and its affiliates (collectively, "S.A.C. Capital" or S.A.C."), are at the center of this illegal scheme, along with a number of other powerful hedge funds, including S.A.C. spin-off Exis Capital, Lone Pine Capital, Third Point, Rocker Partners, and Trinity Capital.  These hedge funds have immense power in the financial markets.  Cohen alone, through his control over and interests in S.A.C. Capital and other hedge funds, controls at least $7 billion in capital, with his trading activity regularly accounting for 3% of the daily volume of trading on the New York Stock Exchange ("NYSE").

4.     Fairfax -- one of the scheme's targets -- is an insurance and financial services company operating in Canada and the United States, including New Jersey.  Fairfax and its operating divisions employ almost 8,000 people worldwide.

5.     Beginning in or about December 2002, after Fairfax's stock was listed on the NYSE, S.A.C. Capital and the other defendants launched a devastating attack -- which the conspirators themselves referred to as the "Fairfax Project" -- on Fairfax, its business, and its stock.  In furtherance of their scheme, defendants, after having taken short positions in Fairfax stock, engaged in an organized effort to damage severely, if not destroy, Fairfax and its affiliated companies by, among other things:

3

- Disseminating false and misleading information concerning Fairfax directly to those most critical to Fairfax's business, including its employees, executives, shareholders, bankers, regulators and rating agencies;

- Disseminating false and misleading information to the markets and the public through purportedly independent analyst reports, statements to the financial press, and the wholesale manufacture of bogus accounting and business issues;

- Engaging in a long-term campaign of personal harassment of present and former employees, executives and shareholders of Fairfax, including personal attacks delivered to executives' clergy and family members; and

- Attempting to instigate regulatory investigations of Fairfax by providing false and misleading information and documentation to regulatory agencies.

6.      Defendants' attack against Fairfax has been aimed at damaging, if not destroying, Fairfax and its business, so that the short-selling defendants could profit from the resulting drastic decline in Fairfax's stock price.  Moreover, at those times since December 2002 when Fairfax's stock price would recover based on Fairfax's positive business results and sound business plan, defendants only intensified their efforts.  Defendants went to such lengths to try to destroy Fairfax that they threatened, harassed and sought to intimidate Fairfax's high-level executives and their families, and they disseminated widely in the market false and defamatory rumors, including, for example, rumors that Fairfax's CEO had absconded with stolen company funds and was being pursued by the Royal Canadian Mounted Police.

7.      Defendants' egregious misconduct brought about their intended result -- further severe damage to Fairfax's business and further massive declines in Fairfax's stock price.

8.      Fairfax brings this action to recover no less than $6 billion in compensatory damages, as well as punitive and treble damages for defendants' egregious misconduct, and injunctive relief barring defendants from continuing to perpetrate their scheme.

4

## THE PARTIES

9.      Plaintiff Fairfax Holdings is a financial services holding company organized under the laws of Canada, with its principal place of business at 95 Wellington Street West, Toronto, Ontario, Canada.

10.     Plaintiff C&F is a holding company organized under the laws of Delaware, with its principal place of business at 305 Madison Avenue, Morristown, New Jersey.

11.     Defendants S.A.C. Capital Associates, S.A.C. Capital Management, and S.A.C. Capital Advisors operate and manage, directly or indirectly, various hedge funds (including defendants S.A.C. Healthco and Sigma), are organized under the laws of Delaware, and maintain their principal places of business at 72 Cummings Point Road, Stamford, Connecticut.

12.     Defendant S.A.C. Healthco is a hedge fund organized under the laws of Anguilla, British West Indies, with its principal place of business at 540 Madison Avenue, New York, New York.

13.     Defendant Sigma is a hedge fund organized under the laws of Delaware, with its principal place of business at 540 Madison Avenue, New York, New York.

14.     Defendant Cohen resides at 30 Crown Lane, Greenwich, Connecticut.  Cohen founded and, directly or indirectly, owns, controls and manages S.A.C. Capital Associates, S.A.C. Capital Management, S.A.C. Capital Advisors, Sigma, S.A.C. Healthco (collectively with Cohen, the "S.A.C. Defendants") and various other hedge funds.  Cohen controls, dominates, and operates S.A.C. Capital without regard to their putatively separate legal form and existence, such that each is the alter ego of the others and of Cohen.  In addition, as set forth herein, Cohen and S.A.C. Capital abused the corporate form by using the entities they control and operate to perpetrate a fraud and injustice.

5

15.     Defendant Exis Capital Management is a corporation organized under the laws of Delaware, with its principal place of business at 875 Third Avenue, New York, New York.

16.     Defendant Exis Capital is a limited liability company organized under the laws of Delaware, with its principal place of business at 875 Third Avenue, New York, New York.

17.     Defendant Exis Differential is a limited partnership organized under the laws of Delaware, with its principal place of business at 875 Third Avenue, New York, New York.

18.     Defendants Exis Integrated is a limited partnership organized under the laws of Delaware, with its principal place of business at  875 Third Avenue, New York, New York.

19.     Defendant Sender is a co-founder of Exis Capital Management.  Sender resides at 109 Greene Street, New York, New York.

20.     Defendant Contogouris is an employee of Exis Capital Management. Contogouris resides at 12 East 78th Street, New York, New York.

21.     Defendant Bernstein is an employee of Exis Capital Management.  Bernstein resides at 401 East 34th Street, New York, New York.

22.     Defendant Heller is the Chief Executive Officer of Exis Capital Management. Heller resides at 200 East 66th Street, New York, New York.  Defendants Exis Capital Management, Exis Capital, Exis Differential, Exis Integrated, Sender, Contogouris, Bernstein and Heller are collectively referred to as the "Exis Defendants."

23.     Defendants Lone Pine Capital, Lone Pine Members LLC, and Lone Pine Associates LLC (collectively, the "Lone Pine Defendants") are limited liability companies organized under the laws of Delaware, with their principal place of business at 2 Greenwich Plaza, Greenwich, Connecticut.

24.     Defendant Rocker Partners is a limited partnership organized under the laws of New York, with its principal place of business at 374 Millburn Avenue, Millburn, New Jersey.

25.     Defendant Copper River, is the successor to Rocker Partners, and is organized under the laws of New York, with its principal place of business at 374 Millburn Avenue, Millburn, New Jersey.

26.     Defendant Rocker was, during times relevant to the complaint, the primary owner and manager of Rocker Partners. Rocker resides at 43 Minnisink Road, Short Hills, New Jersey. Defendants Rocker Partners, Copper River and Rocker are collectively referred to as the "Rocker Defendants."

27.     Defendant Third Point is a limited liability company organized under the laws of Delaware, with its principal place of business at 390 Park Avenue, New York, New York.

28.     Defendant Loeb is the Chief Executive Officer of Third Point. Loeb resides at 7 MacDougal Alley, New York, New York.

29.     Defendant Perry is an employee of Third Point. Perry resides at 9 Wayside Lane, Scarsdale, New York. Defendants Third Point, Loeb and Perry are collectively referred to as the "Third Point Defendants."

30.     Defendant Trinity Capital is organized under the laws of Florida, with its principal place of business at 1819 Goodwin Street, Jacksonville, Florida.

31.     Defendant Trinity Fund is organized under the laws of Florida, with its principal place of business at 1620 Independent Square, Jacksonville, Florida. Defendants Trinity Capital and Trinity Fund are together referred to as the "Trinity Defendants."

32.     Defendant Morgan Keegan is a corporation organized under the laws of Tennessee, with its principal place of business at 50 Front Street, Memphis, Tennessee.

33.     Defendant Gwynn is an employee of Morgan Keegan.  Gwynn resides at 2205 Poplar Drive, Memphis, Tennessee.  Defendants Morgan Keegan and Gwynn are together referred to as the "Morgan Keegan Defendants."

34.     Defendant Lawless was an analyst for Fitch Ratings and currently is an analyst for the Center for Financial Research & Analysis ("CFRA").  Lawless resides at 860 Old Chester Road, Far Hills, New Jersey.

35.     Does 1 through 50, whose identities are presently unknown to plaintiffs, include the limited and general partners of the named defendants, as well as affiliates, co-venturers, co-conspirators, and/or aiders and abettors of the named defendants in the scheme, enterprise, and misconduct alleged in this complaint, including, among others, Canadian and United States financial analysts and portfolio managers.

36.     Plaintiffs and numerous defendants regularly conduct business in the County of Morris in the State of New Jersey.

## STATEMENT OF FACTS

A.     **The Criminal Enterprise**

1.     **The Criminal Scheme**

37.     This action arises from a massive, illegal and continuing stock market manipulation scheme, which has targeted and severely harmed Fairfax, among other companies, and which has resulted in immense ill-gotten profits for S.A.C. Capital, Exis Capital, Lone Pine Capital, Third Point, Rocker Partners, Trinity Capital, and other extremely powerful hedge funds.

8

38. As it relates directly to Fairfax, the scheme involves the concerted efforts of a group of hedge funds, purportedly independent analysts, and their cohorts, who engaged in an organized effort to destroy Fairfax and its affiliated companies by, among other things:

- Undermining confidence in Fairfax and its business by disseminating false and misleading information concerning Fairfax directly to Fairfax's employees, executives, shareholders, bankers, and rating agencies;

- Disseminating false and misleading information through purportedly independent analyst reports, false and misleading statements to the financial press, and the wholesale manufacture of bogus accounting and business issues that have no basis in fact;

- Engaging in a long-term campaign of harassing present and former employees, executives and shareholders of Fairfax, including personal attacks delivered to executives' clergy and family members;

- Attempting to instigate regulatory investigations of Fairfax by providing false and misleading information and documentation to regulatory agencies.

39. Defendants intend to profit from the destruction of Fairfax -- dubbed the "Fairfax Project" -- by short-selling Fairfax's publicly-traded securities -- that is, taking positions in those securities that would be profitable only if Fairfax's stock price declined. A "short seller" or "short" borrows stock from a lender and sells the borrowed stock, expecting that the price of the stock will decline, and that he will therefore be able to purchase the stock later at a lower price, return the stock to the lender and keep the profit. The scheme also employed various "short-equivalent" trading strategies -- such as the purchase of "put" or "swap" options -- that likewise profited from future declines in the stock price of targeted companies. And naked shorting, which was used to establish large short positions in Fairfax without generating price spikes due to the extremely low number of shares actually locatable for shorting.

40. Defendants' scheme goes beyond the attack on Fairfax and has targeted many dozens, if not hundreds, of other publicly-traded companies, as well. Typically, under the

scheme, the defendants, in concert with one another and others, drove down the price of stocks in which they had taken short positions by, among other means, disseminating materially false and misleading information, orchestrating negative news articles, commissioning, dictating, or otherwise influencing unwarranted, false and exaggerated negative reports from biased stock analysts, and using such manufactured misinformation to engender investor suspicion and legal and regulatory scrutiny.

41.     The defendants, in concert with one another and others, also exploited advance access to material non-public confidential information that was shared with them in violation of various fiduciary relationships or otherwise misappropriated. The defendants traded on such material non-public information by shorting stocks before the release of unfavorable information, reducing short positions and/or taking long positions before the release of positive information, and executing various trading strategies otherwise designed to exploit trading volume and volatility surrounding the release of the anticipated information.

42.     These targeted companies suffered enormous damage as a direct consequence of the scheme, which, among other things, directly and materially interfered with their ability to conduct business, implement strategic plans, secure necessary capital, and maintain employee morale, productivity, and recruiting. The scheme also inflicted enormous financial harm on investors in the targeted companies, who collectively lost many billions of dollars to the defendants who reaped correspondingly enormous profits at the expense of those innocent investors.

2.      **The Enterprise Members**

43.     The illegal stock manipulation scheme hereinafter described (the "Enterprise")
was devised and executed by an association, associations, and associations-in-fact comprised of,
among others, the following:

a.      **The S.A.C. Defendants**

44.     The S.A.C. hedge funds derive their names from the initials of their founder and
leader Steven A. Cohen. Cohen is known in the industry as the "most powerful trader on Wall
Street you've never heard of" because of the "highly secretive and stupendously successful
S.A.C. funds he controls." Through S.A.C. Capital, Cohen controls no less than $7 billion and
regularly accounts for 3% of the NYSE daily volume and 1% of the NASDAQ daily volume.
These investment dollars are channeled through several different "portfolio companies" or funds
-- including a core fund, a global diversified fund, a health-care fund, and defendant Sigma fund
(comprised of Cohen's personal monies), all of which Cohen manages in a highly integrated and
hands-on fashion.

45.     Cohen's market influence, however, extends much further than the S.A.C. funds
he directly controls. In addition to the billions he controls directly through those funds, he has
also invested billions more in non-S.A.C. funds, including funds formed by former S.A.C.
managers who are required to agree as a condition of S.A.C. employment to permit Cohen to
hold up to a 50% interest in any hedge funds they form after leaving S.A.C. Through such
"satellite" fund investments, Cohen is better able to mask his trading strategies and the frequent
market manipulation employed in executing those strategies. Consequently, Cohen personally
has one of, if not the, most powerful market-moving capabilities on Wall Street.

11

46.     In the first 12 years since he formed S.A.C. Capital Advisors, Cohen had regularly generated incredible returns in the range of 40% per annum. Reflecting this extraordinary performance, investors pay him a 50% success fee, far above the 20% industry standard. As a result, Cohen's annual S.A.C. management fee regularly has exceeded $400 million, which is in addition to profit he earns on his own monies invested in Sigma and other S.A.C. and non-S.A.C. funds.

47.     Unlike most hedge funds, S.A.C. seeks no volume discount on its enormous trading costs and commissions, and consequently pays over $150 million in annual commissions -- making it one of Wall Street's top ten trading customers. In addition, S.A.C. frequently purchases secondary offerings, that include substantial built-in brokerage commissions for banks, and thereby further increases S.A.C.'s already substantial financial leverage and influence. Cohen uses this enormous financial leverage to support S.A.C.'s trading strategies by demanding access to material non-public information from financial institutions with whom S.A.C. does business, including non-public inside information concerning public companies and other clients to whom those institutions owe fiduciary and other duties of non-disclosure, and the substance and timing of reports and recommendations being issued by analysts for those institutions. Financial institutions and their employees understand -- because S.A.C. has told them -- that a failure to provide such information will result in the loss of S.A.C.'s substantial business.

48.     S.A.C. uses its enormous financial leverage to not only extract and trade on material non-public information but also to actually dictate the substance and timing of certain material information being disseminated to the market. For example, S.A.C. regularly uses its substantial financial leverage to direct and influence the analysis and recommendations of purportedly independent stock analysts and the time such analysis and recommendations are

12

issued to the market, without any disclosure of the material conflict of interest reflected by its leverage and influence. Like S.A.C.'s demand for material non-public information, it is now simply understood in the industry that failing to provide influence and control over the substance and timing of analyst reports will result in the loss of S.A.C.'s substantial business.

49.     S.A.C. directly or through its affiliates or satellite funds is an important Morgan Keegan client, and Gwynn collaborates closely with S.A.C., including with Steven Cohen, who he speaks with directly both in person and in more frequent telephone communications.

50.     To maximize the impact of its access to material non-public information and control and influence over the substance and timing of analyst reports, S.A.C. focuses on stocks with valuations easily influenced by market information such as thinly traded stocks, small to modestly capitalized stocks, and stocks in volatile sectors. S.A.C. rarely invests in such companies long-term but instead pursues short-selling or event-driven trading strategies based on S.A.C.'s access to -- and control over -- material non-public information, and the substance and timing of stock analyst reports.

51.     To maximize the use of S.A.C.'s substantial market influence, under Cohen's direction, S.A.C. also places extreme pressure on its traders, managers, employees, and agents to produce at all costs. S.A.C. generates such intense pressure by, among other things, imposing what is described internally at S.A.C. as an "eat what you kill" compensation scheme under which compensation depends on individual trading performance and not -- as is the industry norm -- on the fund's overall performance. Those who fail to produce are quickly terminated: "At S.A.C., you either perform or you're dead," according to one public report by an insider. Such policies ensure that those who remain at S.A.C. are willing and capable of doing whatever it takes to secure the extraordinary performance Steven Cohen demands. The enormous pressure

13

to perform at S.A.C. was particularly acute in 2003 after Cohen had experienced what insiders called his "very disappointing" 14% returns and $100 million in management fees in 2002.

52.     From spring 2003 to the present -- as it had in the past -- the S.A.C. Defendants orchestrated short-selling "bear attacks" on numerous publicly traded companies, including Fairfax.  They prosecuted these attacks on Fairfax and other targeted companies by, among other things, paying, pressuring, and otherwise influencing purportedly independent analysts and others working with S.A.C. to disseminate materially false and misleading information about the business, accounting, and corporate governance of these targeted companies.  These materially misleading misinformation campaigns devastated the targeted companies by tarring their business reputations, eroding investor confidence, and devastating management and employee morale and focus, and thereby artificially driving down the stock price to the enormous benefit of the short-selling hedge fund defendants and the extreme detriment of the companies and their legitimate investors.

53.     The financial firms and associated analysts with which S.A.C. regularly does business directly, and indirectly through Cohen's satellite funds, include defendants Morgan Keegan and Gwynn.  As a result of S.A.C.'s frequent communications with Morgan Keegan and Gwynn, S.A.C. learns when Gwynn intends to issue reports and what they will say and, indeed, frequently directs Gwynn on when to issue reports and what to say.

        b.     **The Exis Defendants**

54.     In 1998, Sender and Ken Lissak, highly-successful S.A.C. traders and senior Cohen lieutenants, left S.A.C. to form hedge fund Kadem Capital ("Kadem").  Like S.A.C., Kadem charge a 50% success fee, concentrated its focus on short-selling, used trading and other financial leverage to influence the substance and timing of market moving analyst reports, and

used purportedly "custom" research reports in order to disseminate its own views supportive of its trading positions disguised as independent and unbiased research.

55.     In its first four years, Kadem enjoyed average annual returns in excess of 30%. At the end of 2001, Sender bought out Lissak's interest in Kadem and changed the name to Exis Capital Management. By late 2003, Exis was managing over $1.5 billion and pursued high-risk trading strategies, including in high-risk illiquid positions such as concentrated short-selling bets. S.A.C. and Cohen also are investors, directly and indirectly, in Exis, and Sender and Cohen collaborate in carrying-out attacks on companies in whose stock they have taken short positions. Also like S.A.C., Exis is a significant client of Morgan Keegan and has substantial influence over Gwynn, with whom Exis also collaborates closely.

56.     However, beginning in December 2003, Exis suffered staggering losses, massive investor redemptions and personnel defections as a result of a concentrated short position in BlackBerry-maker Research in Motion ("RIM") when that company's stock price jumped 50% on December 23 and continued to increase over the next six months. By June 2004, Exis had shrunk to a $700 million fund and was struggling to retain its remaining investors. To salvage his reputation and business, Sender blamed Kenneth Grant ("Grant"), also formerly of S.A.C., for this investment debacle. Although Exis survived, the fund suffered for years as investors went elsewhere. Accordingly, it was critical to Exis's continued survival that there be no such additional short-selling disasters.

57.     According to published reports, Sender employs persons who utilize "unorthodox methods" to "get the job done." For example, in connection with a failed investment, Sender retained the now incarcerated private detective Anthony Pelicano to "ensure that Sender got his money back." As part of that effort, Pelicano engaged in illegal wiretapping that Sender knew

about, and knew was illegal, but did nothing to stop.  Likewise, as set forth more fully below, when Sender faced catastrophic short-selling losses in Fairfax stock, he turned to another shadowy operative who utilized "unorthodox" and illegal methods to drop the price of stocks his clients had sold short.

58.     Defendant Heller grew up with Sender, who later appointed him the Chief Executive Officer of Exis.  Along with Sender, Heller approved, managed, and participated in the illegal short-selling activities against Fairfax that are described in detail below.

### c.     Spyro Contogouris

59.     Spyro Contogouris is an operative for short-selling hedge funds that pay him to drive down the price of stocks in which they have large short positions and otherwise to secure material non-public information on which they trade.  To secure this objective, Contogouris disseminates materially false, misleading, and unfounded disinformation about target companies to their employees, shareholders, analysts, partners, customers, and other important constituencies.  This dissemination occurs through, among other things, (a) anonymous or misrepresented telephone calls, e-mails and personal communications; (b) stock research reports Contogouris prepares and circulates without disclosing -- as required by law -- his financial relationship with persons shorting that stock; (c) stock research reports prepared by third-parties who were paid or otherwise influenced to support short-sellers; and (d) orchestrating stories in the media based on such disinformation.

60.     In addition to disseminating disinformation, Contogouris plans and directs manipulative trading activity, attempts to instigate regulatory and law enforcement investigations, and interferes with the target's business by harassing, threatening, intimidating,

and distracting its employees, officers, directors and critical business relations. Through this same approach to market insiders, Contogouris attempts to elicit material inside information.

61.     Contogouris worked for and was compensated by or on behalf of various Enterprise members, including but not limited to Exis, S.A.C., and Third Point, not only to drive down the price of Fairfax stock (as well as other stocks) but to "bring down Fairfax" itself. As part of his work on Fairfax, Contogouris relocated to New York City and with his cohort Max Bernstein operated out of Exis's New York offices where they each had their own desks and phones. At times Contogouris and Bernstein identified themselves as Exis employees, at other times they represented that they were employees of a sham entity called MI4 Reconnaissance, at other times they conflated the two by, for example, delivering business cards associating them with MI4 Reconnaissance but listing as their phone number the Exis phone number, and at still other times they identified themselves with aliases and false personas. Contogouris claims that he uses aliases and false personas to preserve his ability to deny his activities if ever forced to testify about such events -- that is, to preserve his ability to commit perjury.

62.     Contogouris traveled frequently in support of the Enterprise's objective and was in regular discussions concerning his activities with, among others, Sender, Heller, Third Point, Perry, S.A.C., Gwynn, Bernstein, Lawless and other Enterprise members. Contogouris pursued the Enterprise's Fairfax objectives aggressively by, among other things:

- Relentlessly disseminating highly misleading disinformation about Fairfax and Watsa to employees, shareholders, analysts, rating agencies, auditors, journalists, and regulators via, among other means, e-mail, bogus or corrupted "research" reports, internet chat boards, a defamatory "Prem Watsa" website, and in personal meetings and telephone calls;

- Harassing and intimidating senior executives, their staffs, and their families through anonymous or misrepresented communications, including communications or unsolicited "meetings" with Watsa's executive assistant,

17

Pastor, family, and others;

- Misappropriating material non-public information for the purpose of supporting the Enterprise's trading strategy and attempting to coerce insiders into cooperating with him; and

- Orchestrating negative analyst coverage -- particularly through Gwynn, as well as through MI4 Reconnaissance reports -- and news as well as manipulative trading activity in Fairfax stock.

63.     Contogouris has been the subject of numerous litigations, been judicially removed from fiduciary positions for abuses, and has been sanctioned in the past by courts for contemptable conduct.

### d.     Max Bernstein

64.     Max Bernstein is a hedge fund operative who works with Contogouris.  Like Contogouris, Bernstein operates under various aliases and is and was  responsible for implementing much of the Enterprise's intimidating, harassing, and defaming conduct against Fairfax, including the transmission of highly defamatory and threatening communications and associated materials to Watsa's Pastor, his assistant, Fairfax's shareholders, analysts, and rating agencies.

### e.     The Third Point Defendants

65.     Third Point is a $4.3 billion hedge fund based in New York City that is run by Loeb.  Perry is a senior advisor at Third Point.  From 2003 to 2005, Perry was the co-manager with Jim Chanos at short-selling fund and Enterprise member Kynikos Associates, Ltd., and from 2001-2003 was a senior portfolio manager at S.A.C. Capital Advisors. Perry  worked and continues to work closely with Contogouris in disseminating disinformation about Fairfax, including orchestrating negative press reports, republishing those negative press reports to

Fairfax's shareholders, analysts, rating agencies, and others, and attempting to instigate regulatory investigations of Fairfax.

        f.    **Trinity Capital**

66.    Trinity Capital is an approximately $500 million hedge fund headquartered in Jacksonville, Florida -- which is Enterprise member Gwynn's hometown -- with an office in Memphis, where Morgan Keegan, Gwynn, and Gwynn's co-author Matt Cantrell ("Cantrell") reside. George White is a principal of Trinity Capital and affiliated hedge funds, including Wellspring Capital. Both Trinity and Wellspring Capital have long standing relationships with Gwynn and are research clients of his and brokerage clients of Morgan Keegan. Cantrell's wife managed the office of Trinity Capital until just before Gwynn and Cantrell initiated coverage on Fairfax in early 2003 when she abruptly left Trinity to work at an affiliated fund in which White was a principal.

        g.    **The Rocker Enterprise Members**

67.    David Rocker was during times relevant to the complaint the primary owner and manager of hedge fund Rocker Partners operating in Millburn, New Jersey. Like S.A.C., a cornerstone of Rocker Partners success is its ability regularly to influence and direct the substance and timing of analyst research -- both so-called "independent" and brokerage-based research -- to support Rocker Partners short positions. Rocker is also a substantial shareholder in the financial news and commentary website TheStreet.com and other hedge funds and former colleagues have publicly praised his "uncanny ability to entice a select number of journalists to do negative stories on his short sales time and time again," which those familiar with Rocker describe as "a key reason for his success."

h.    The Morgan Keegan Defendants

68.    Morgan Keegan is a mid-sized investment bank based in Memphis, TN and a subsidiary of Regions Financial Corp.  Gwynn is an equities research analyst at Morgan Keegan focused on the insurance industry.  In 1985, Gwynn started an investment company called First Coast Capital with a partner Willis Ball.  In 1993, First Coast Capital failed and two years later Gwynn filed for personal bankruptcy.  Over the course of the next several years Gwynn worked as a research analyst for the Colorado office of a small securities firm, Montag & Joselson.  In 2002 -- with the help of certain connections to powerful hedge funds with whom he had developed a relationship -- he became an insurance industry  research analyst at Morgan Keegan, which was itself dependent on hedge fund business.

69.    Morgan Keegan's brokerage business and Gwynn's compensation are directly and indirectly dependent on the fees and commissions Morgan Keegan earns when large hedge funds direct their substantial trading volumes and other business to Morgan Keegan.  Gwynn and the Morgan Keegan head of equity capital, Collie Krausnick ("Krausnick") frequently travel to New York and Connecticut to solicit business from major hedge funds including Enterprise members S.A.C., Exis, Third Point, and Lone Pine.  It is understood among Morgan Keegan, Krausnick, and Gwynn and these and other hedge fund clients that the quid pro quo for such business is advance notice of and influence over the release and content of analyst reports on companies in which these large clients have positions.

70.    In the case of Fairfax, Gwynn collaborated with certain hedge funds, including Enterprise member Trinity Capital, in developing extreme criticisms of Fairfax to support both short-term and long-term shorting strategies dubbed "the Fairfax Project."  Gwynn communicated these developed criticisms and his intention to release a highly negative report

20

containing those criticisms in a series of road show presentations to major hedge funds including, among others S.A.C., Lone Pine, Kynikos, Highfields, Greenlight Capital, and Perry Capital. The hedge funds participating in this discussions understood at their conclusion that Gwynn intended to initiate coverage of Fairfax with an extremely critical report, they understood and contributed to the substance of the criticisms to be included in the report, and they understood that the report's release would be timed to provide them an opportunity to establish their short positions. These critical Morgan Keegan clients also understood that once they had established a short position in Fairfax, Gwynn would continue to support that position with negative reports until they covered. This understanding was critical because the Fairfax Project contemplated short-term and longer term components, the latter of which involved enormous potential exposure to the Enterprise if the stock price increased substantially.

### i.    Other Enterprise Members

71.    The Enterprise also includes other members known and unknown who participated in and facilitated the scheme, including but not limited to Lawless, John Hempton, and website Stocklemon.com each of whom individually and collectively collaborated and continue to collaborate in the disinformation campaign against Fairfax; hedge funds Perry Capital, Viking Global Investors, Platinum Asset Management, Greenlight Capital, Lighthouse Capital, Ziff Brothers, and Pequot Capital; and the trading and brokerage departments of major Wall Street and less prominent firms that facilitated the Enterprise's manipulation of Fairfax stock by (a) rebroadcasting disinformation the Enterprise fed to them; (b) engaging in manipulative trading practices to support the short-selling attack; and (c) permitting Enterprise members to heavily short Fairfax stock in violation of short selling rules.

B:     Fairfax

1.     Fairfax's Business

72.     Plaintiff Fairfax Holdings is an insurance and financial services holding company that owns, either wholly or substantially, several operating insurance companies and has been under present management since September 1985. Fairfax Holding's corporate objective is to achieve a high rate of return on invested capital and build long-term shareholder value. Fairfax Holdings is publicly traded on the Toronto Stock Exchange and the New York Stock Exchange under the symbol "FFH." Fairfax Holdings began trading on the New York Stock Exchange on December 18, 2002, as a result of Fairfax's increasing focus on its United States-based business. In 2003, Fairfax also switched to reporting its results in U.S. dollars.

73.     Fairfax Holdings itself is, and has been, operated by a very small group of people, who focus on strategic, financial and capital allocation activities for the entire holding company group, as well as monitoring the performance of those operating companies. Although the operating divisions employ almost 8,000 employees, there are only 50 employees at the holding company's Toronto headquarters.

74.     The insurance operating companies generate a large amount of cash, which must be invested and can generate significant profits. One of the benefits of the structure of the Fairfax group of companies is that the investment management for the insurance operating companies is centralized, with a focus on long-term, value-oriented total returns. This structure leaves the individual operating companies to focus without distraction on their insurance underwriting businesses.

75.     Fairfax operates its business, as it has for over twenty years, under certain guiding principles. Fairfax, as a matter of policy, takes a long-term view of its business and its investing.

22

Its focus is on benefiting its customers, shareholders and employees in the long-run, even if pursuing those goals means that in a particular circumstance the company must sacrifice short-term profits -- and sometimes suffer short-term declines in stock price. Consistent with this approach, Fairfax's operational goal is to maximize long-term growth in book value per share and not quarterly earnings. Fairfax's growth strategy is focused on growing its internal operations and business, in conjunction with friendly acquisitions. Between 1985 and 2005, book value per share has increased 100-fold from $1.52 to $151.52. This focus on long-term growth has led Fairfax to eschew promotion and publicity, in contrast to many companies that have been criticized for promoting their stock and neglecting their companies' operations. Fairfax has instead tried to let its results speak for themselves.

76.     Fairfax began in 1985 with one small trucking insurance company in Canada with Cdn$14 million in premiums and Cdn$10 million in shareholders' capital. Since that time, Fairfax has built three substantial, disciplined, underwriting-focused insurance and reinsurance companies and a fledgling insurance business in Asia. Fairfax has an outstanding investment team with a proven track record over the long-term and the ability to invest opportunistically anywhere in the world.

77.     Fairfax was founded, and continues to be led, by V. Prem Watsa ("Watsa"), the President and CEO. Watsa was born in Hyderabad, India and moved to London, Ontario in 1972. In 1985, an investment group controlled by Watsa purchased control of Markel Financial Holdings, whose sole asset was a virtually bankrupt Canadian-based specialist trucking insurance company. In 1987, the company was renamed Fairfax, short for "fair, friendly acquisitions." Throughout the late 1980s and early 1990s, Fairfax bought a number of property and casualty insurers and restructured their operations. By 1993, Fairfax had over Cdn$1 billion in assets.

23

Watsa maintains effective voting control of Fairfax, but has limited his total compensation to Cdn$600,000 each year, with no bonus or other profit participation and no participation in any equity plans (other than the employee payroll share purchase plan) or other equity incentives. This allows Watsa's status as the company's largest voting shareholder to align his interests directly with those of Fairfax investors. In fact, Watsa currently has no material business interests or investments outside of his shareholdings in Fairfax, with the result that his net worth is substantially made up of his investment in Fairfax.

78. Fairfax takes its obligation to provide disclosure to its shareholders very seriously, and in circumstances where it is necessary to convey negative news, Watsa is straightforward and blunt in his assessment of the company's performance, telling investors directly when things have not gone as planned. For example, in the 2005 Annual Report, Watsa wrote that while Fairfax had built a great roster of operating companies, it had not recently achieved the desired results: "The last seven years have been very disappointing to me personally, to the management of the company, to our Board and of course to you our shareholders." This direct and plain discussion of the state of Fairfax's business, and the transparent and sound business plan, have attracted a loyal group of shareholders to Fairfax. As a result, its stock is very thinly-traded, with an average daily volume on the New York Stock Exchange of only approximately 165,000 shares traded, with a significant portion of that volume attributable to short sales.

79. Fairfax's insurance business is operated by a number of operating companies, which are decentralized and run by their respective presidents, except for performance evaluation, succession planning, acquisitions and financing, which are done by or with Fairfax. Complete and open communication between Fairfax and its subsidiaries is standard operating procedure at Fairfax. Share ownership and incentives are encouraged throughout the group in

order to align the interests of management with the shareholders of Fairfax and its operating companies.

80.     Fairfax undertakes quarterly reviews of group-wide exposure to potential catastrophic events and ensures that the operating companies are amply capitalized to address any such events.  In addition to monitoring at the Fairfax level, each of the subsidiary operating companies regularly monitors potential exposure, analyzed by loss ratio impact, surplus impact, risk/reward and market condition.  Fairfax has a small, independent Board of Directors with Watsa being the only non-independent management director.  Fairfax's Audit Committee is composed of all independent directors.

81.     Fairfax's investment portfolio, which had a total market value of $15.2 billion as of March 31, 2006, is managed in a conservative manner intended to emphasize capital protection.  As a consequence, there is a focus on maintaining large cash reserves, a high-quality bond portfolio, a hedged equity portfolio, and credit default protection.  Fairfax's long-term investment performance has greatly exceeded applicable benchmarks; for example, through 2005, Fairfax achieved an annualized rate of return of 19.8% on its common stock investments on behalf of its U.S. companies over the prior 15 years.  By contrast, the Standard & Poor's 500 Index returned an annualized rate of return of 11.5% over the same period.

        a.      **Crum & Forster**

82.     Plaintiff C&F, based in Morristown, New Jersey, is a holding company with national commercial property and casualty insurance subsidiaries in the United States writing a broad range of commercial coverages.  C&F is a Delaware holding company that is indirectly 100% owned by Fairfax Holdings.  Fairfax Holdings purchased C&F from Xerox for $565 million in August 1998.

83.     In 2005, C&F's net premiums written were $866.9 million. At year-end 2005, C&F had capital of nearly $1 billion and had 1,015 employees.  C&F is focused on underwriting profitability: its average combined ratio1 in the past four years is 105.2% (93.0% on an accident year basis excluding the 2004 and 2005 hurricanes) and it has earned an average return on equity since acquisition in August 1998 of 8.3% (at the insurance company level).  C&F's debt is registered with the SEC, and it therefore has access to financing in the capital markets and consequently has substantial financial flexibility.

84.     Based on the experience and underwriting expertise of its management, C&F, through its operating subsidiaries, writes new lines of business and expands existing classes of business depending upon market conditions and expected profitability, offers insurance products designed to meet specific insurance needs of targeted insured groups and underwrites specific types of coverage for markets that are generally underserved by the industry.

### b.     Northbridge Financial Corporation

85.     Northbridge Financial Corporation ("Northbridge"), based in Toronto, Canada, provides property and casualty insurance products through its operating subsidiaries. Northbridge is one of the largest Canadian commercial property and casualty insurers and writes insurance primarily in the Canadian market.  In 2005, Northbridge's net premiums written were Cdn$1,188.5 million and, at year-end, Northbridge had capital of Cdn$1,026.8 million and had 1,573 employees.  Shares in Northbridge are publicly-traded on the Toronto Stock Exchange, and, as of year-end 2005, Fairfax owned 59.2% of the outstanding shares.  Northbridge is focused on underwriting profitability: its average combined ratio in the past four years has been 92.7% and it has earned a 16.5% return on equity over 20 years at the insurance company level,

---

1       "Combined ratio" is a combination of the claims ratio and the expense ratio.  A combined ratio below 100% generally indicates profitable underwriting prior to the consideration of investment income.

26

with no leverage. In addition, it has an admirable reserving track record: over the past ten years, it has had a weighted average annual redundancy of 4.8% on an accident year basis.

### c.    Odyssev Re. Holdings

86.    Odyssey Re Holdings Corp. ("Odyssey Re"), a Delaware corporation based in Stamford, Connecticut, underwrites treaty and facultative reinsurance as well as specialty insurance business, with principal locations in the United States, Toronto, London, Paris, Singapore and Latin America. Odyssey Re is a public company, traded on the New York Stock Exchange. Odyssey Re operates its business through its principal operating subsidiaries.

87.    At year-end 2005, Odyssey Re had capital of over $1.5 billion and had 592 employees. Shares in Odyssey Re are publicly-traded on the New York Stock Exchange, and, as of year-end 2005, Fairfax owned 80.1% of the outstanding shares. One of the largest broker reinsurance companies in the world, Odyssey Re has a global franchise with gross premiums in 2005 of $2.6 billion and net premiums of $2.3 billion. It is focused on underwriting profitability: its average combined ratio in the past four years has been 102.8% (86.6% on an accident year basis, excluding the 2004 and 2005 hurricanes) and it has earned an average return on equity for the four years since 2001, the year in which it went public, of 11.1%.

### 2.    The Critical Rating Agency Role

88.    A number of independent agencies rate the financial strength of insurance companies. Each has its own rating scale, its own rating standards, its own population of rated companies, and its own distribution of companies across its scale. Fairfax and its operating companies are rated by several rating agencies, including A.M. Best, Standard & Poor's, Moody's and Dominion Bond Rating Service.

89.     The views of the ratings agencies are critical to the success and viability of the businesses of Fairfax and its operating companies.  Due to the nature of the insurance business, an insurer's most important asset is the confidence its customers have in the ability of the insurer to pay potential claims, now and many years in the future.  A diminished rating from a rating agency will often cause customers to divert underwriting business to competitors and to avoid relationships with an insurer that possesses a subpar rating.  A severe ratings downgrade has the potential to have an immediate and catastrophic effect on an insurer's business, effectively making it impossible for that insurer to write new business and driving it into "runoff."

90.     As a result of the reliance that customers place on agency ratings, insurers, including Fairfax and its operating companies, work with the rating agencies to ensure that they have a full and accurate picture of the company's business.  Also, as a result of the importance of agency ratings to the businesses of Fairfax and its operating subsidiaries, in the event that inaccuracies appear in reports issued by ratings agencies, it is the policy and practice of Fairfax and its operating companies to promptly discuss the inaccuracies with the rating agencies and to ensure that the rating agency in question has an accurate picture of the business.

## C.     The Relentless Criminal Short-Selling Attack on Fairfax

91.     In 2002, Fairfax announced its intent to apply for listing on the New York Stock Exchange.  At the time, the Enterprise members collaborated with Gwynn in developing an aggressive short-selling campaign to be driven by disinformation and corrupted and materially misleading equity research.  This campaign was dubbed the "Fairfax Project."  The Fairfax Project contemplated a short-term component based on a highly negative Morgan Keegan report that would created an immediate and dramatic drop in the price of Fairfax stock from which Enterprise members would reap enormous profits; and a longer-term strategy to cripple Fairfax's business through a much more ambitious campaign of disinformation and dirty tricks.

28

1.     **The Short-Term "Fairfax Project"**

92.     On December 16, 2002, Fairfax confirmed in a press release that its application for NYSE listing had been approved and the company would be listed on December 18, 2002. Immediately upon listing, Enterprise members began shorting the stock aggressively. In order to facilitate the rapid accumulation of their short positions, Enterprise members listed (without any notice to or desire on the part of Fairfax) Fairfax shares on the Berlin Exchange, which they used to circumvent United States restrictions on short-selling. In addition, market makers working with Enterprise members permitted them to engage in substantial short-selling even though no shares could be located to borrow or reasonably be expected to be located. In the first four weeks of trading on the NYSE, short-selling accounted for as much as almost 60% of the trading volume and the price declined $14 or 15%. By January 14, 2003, there were an astounding two million Fairfax shares sold short.

93.     After the members of the Enterprise had accumulated their desired short positions, stories fed by the Enterprise members began appearing in the media echoing the materially misleading and unfounded criticisms the Enterprise had developed with Gwynn. Immediately thereafter, on January 16, 2003, Gwynn initiated coverage on Fairfax with an "underperform" rating in a report that contained the most incredible materially misleading and unfounded criticisms, and ignored, dismissed, or diminished all positive and mitigating facts.

94.     By way of example, Gwynn's January 16, 2003 report contained, among others, the following materially false, misleading, and completely unfounded assertions:

- Fairfax was $5 billion under-reserved, when in fact no reasonable application of a credible reserve-setting methods would support anything remotely close to such a deficiency. Gwynn's calculation was based on a methodology that he understood was invalid and in violation of the most fundamental reserve setting practices.

29

- Fairfax's shareholder equity was negative $4.4 billion, which was a number no credible methodology based on reasonable assumptions would support, and which Gwynn based on what he understood were unreasonable assumptions and invalid pseudo-methodologies.

- Fairfax's reported goodwill of $180 million as of September, 30, 2002 was actually $0 and would not survive the FY 2002 year-end audit. No credible methodology based on reasonable assumptions would support these assertions, and Gwynn instead used what he knew were unreasonable assumptions and invalid pseudo-methodologies.

- Fairfax had no likelihood of securing realized gains for the 2003-2004 period, which was an assertion for which there was no reasonable basis and for which Gwynn understood there was no reasonable basis.

- Fairfax's reported deferred tax asset of $1.079 billion was unrecoverable and thus worthless, which was an assertion for which there was no reasonable basis and which Gwynn understood lacked a reasonable basis.

- Fairfax failed to provide Mr. Gwynn access to management when in fact Mr. Gwynn wrote his report without making any genuine effort or request for access to management or attempts to verify his grossly unreasonable assumptions.

The grossly distorted picture of Fairfax that these and other outright false and unfounded assertions created was substantially aggravated by Gwynn's completely omission of all positive or mitigating facts.

95.     Gwynn's report accomplished the Enterprise's intended objective. Promoted heavily by the Enterprise and its operatives, the report's drastic assertions and their dire implications garnered extraordinary attention and equally great concern. Fairfax's stock plummeted 32% to an 8-year low on record volume 14-times higher than normal. By January 30, 2003, Fairfax stock had plummeted further to approximately $58 on substantially above-average trading in the two weeks after the Enterprise issued the Gwynn report. Industry and financial press sources uniformly cited Gwynn's report, and particularly his astounding assertion that Fairfax was $5 billion under-reserved as the sole precipitating cause for this steep decline on enormous volume.

30

96.     With the stock price drop, Enterprise members began covering large portions of their short positions for enormous short-term profits.  With the short-term component of the Fairfax Project substantially complete, and unable to defend his absurd reserve estimates, on January 30, 2003, Gwynn released a report admitting that his estimated reserve deficiencies were wildly inflated by over $2 billion or (40%) and his shareholder equity estimates were wildly understated by over $2 billion.  As an excuse, Gwynn claimed he erroneously double-counted TIG subsidiaries.  This excuse -- offered by a purportedly seasoned, careful, and unbiased professional analyst initiating coverage with estimates he knew were beyond the pale of reasonableness -- is simply not credible.  Instead, such egregious inaccuracies in this context can only reasonably be construed as the product of an intentional attempt to cause a massive stock price drop.

### 2.     The Long-Term Fairfax Project

97.     Although Enterprise members had covered substantial portions of their shorted shares, they had also retained substantial short positions and added to them as the stock rebounded, understanding that Gwynn's January attack was just the beginning of an open-ended campaign directed at the far more ambitious and lucrative objective of causing Fairfax to fail.

#### a.     Gwynn's February 11, 2003 Report

98.     Accordingly, on February 11, 2003, Gwynn issued another highly critical report despite Fairfax's reported record fiscal year.  Among other materially false, misleading and unfounded assertions contained in the report, Gwynn claimed that Fairfax (a) had been unable to refinance debt obligations when in fact it had merely elected to redeem those obligations because doing so was economically better; (b) failed to strengthen asbestos and environmental reserves in 2002 as did the industry when in fact is had strengthened them by $133 million; (b) failed to

31

secure the reinsurance needed for the release of $300 million in TIG assets held in trust, implying that this was not achievable when in fact it was and would be achieved by quarter end; and (c) had suffered a $17.69 million annual loss instead of a record gain based on readjustments Gwynn applied to Fairfax's reported financials for the sole purpose of diminishing its strong performance.

99. Enterprise members used Gwynn's unreasonably negative and materially misleading analysis to pressure shareholders, analysts, and rating agencies into selling their shares or downgrading their ratings. In February, despite Fairfax's record year, Standard & Poor's reduced Fairfax's credit rating to BB from BB+ and the credit rating of its TIG subsidiary from BB to BB-. Fairfax Stock experienced another substantial decline in heavy trading action over the course of the next two weeks to arrive at a new low by February 27, 2003.

b. **Gwynn's March 10, 2003 Report**

100. Fairfax's stock price recovered leading up to the release of its annual report on March 10, 2003. As always, the 130-page single-spaced report provided enormous detail on the company's material business issues and confirmed the company's record fiscal year in 2002 and its sufficient cash and available credit to meet obligations, even without the receipt of the dividends Gwynn had previously incorrectly speculated would not be available to Fairfax.

101. Nevertheless, Gwynn immediately issued a report containing additional materially false, misleading, and recklessly unfounded statements designed to stoke the uncertainty over Fairfax's liquidity that the Enterprise had already manufactured. In addition to repeating and affirming his prior misleading and unfounded assertions, Gwynn's March 10, 2003 report made, among others, the following false, misleading and unfounded assertions designed to maintain and aggravate the unfounded liquidity concerns he and the Enterprise had manufactured:

32

- Fairfax had significantly under-reserved for asbestos and environmental liability when in fact no estimate using reasonable assumptions and a credible methodology would have supported his assertions, which Gwynn understood and ignored. In addition, the potential A&E exposure to which Gwynn referred was also covered by reinsurance, thereby further demonstrating the speciousness of Gwynn concerns.

- Fairfax's ability to collect its reinsurance cover from Swiss Re was actually not backed by Swiss Re but by a "non-recourse" subsidiary of Swiss Re, thereby implying the reinsurance was not backed by a credit-worthy underwriter when in fact this reinsurance was backed by European Reinsurance Co. of Zurich, a special-purposes vehicle of Swiss Re that had an A+ credit rating and Fairfax had funds held collateral.

- Fairfax was not sufficiently liquid to survive 2003 when in fact by any reasonable analysis it had sufficient existing liquidity and ready access to more than enough liquidity to meet all its existing and reasonably contemplated obligations in 2003.

### c. Gwynn's April 3, 2003 Report

102.    As Fairfax's stock price began to recover from the negative impact of his March 10, 2003 report, Gwynn continued his dogged defense of the Enterprise's scheme by issuing another report on April 3, 2003 repeating and reaffirming his previously false, misleading, and unfounded assertions and adding the following:

- Fairfax should write-off as worthless Cdn$293 million in subsidiary Lindsey Morden goodwill even though he lacked any reasonable facts or rationale for this assertion.

- Fairfax subsidiary ORC was late in filing its 2002 financial statements even though this was not true and, even if it were, it would be immaterial to the investment value of Fairfax.

### d. Gwynn's Unfounded Scaremongering Is Exposed

103.    Gwynn's unfounded alarms concerning Fairfax's liquidity were exposed on April 11, 2003 when Fairfax announced it would conduct an initial public offering of its

33

Northbridge subsidiary, which was successfully priced on May 21, 2003, and thereafter completed.

104.    Similarly, on May 2, 2003 Fairfax announced first quarter results that included a net increase in earnings to $154.6 million, an 18.6% increase in net premiums written ($1.6 billion), a combined ratio of 98.1%, and realized gains on investments totaling $228.2 million for the first quarter of 2003. By May 21, 2003, Fairfax stock had rebounded from a low earlier in the year of $47 to $87.

105.    Thereafter, Gwynn's unfounded liquidity concerns and other scaremongering were further discredited on May 30, 2003 when Fairfax announced a $300 million debt offering by Crum & Forster. That offering closed on June 5, 2003, by which time the stock had rebounded to $152 and would continue to climb to $174 by July 14, 2003.

### e.    Gwynn's Dogged Defense of the Enterprise's Short Position

106.    Over the remainder of 2003 and 2004, Fairfax repeatedly and in increasingly strong terms demonstrated that the Enterprise's grossly exaggerated warnings and disinformation about Fairfax's purportedly dire financial condition were unfounded. As a result, during this period Fairfax stock remained consistently above $100 and climbed steadily to almost $170 by the end of 2004. Throughout this period, however, short interest remained above 1.5 million shares and climbed steadily in the latter half of 2004 to almost 2.7 million shares.

107.    The enormous and sustained short interest that existed in Fairfax stock since it listed on the NYSE has been comprised of initial Enterprise members who retained, traded in and out of, and, in some instances, increased their short positions in the long-term objective of devastating Fairfax's business and thereby its stock price. In addition, Enterprise members were encouraged to remain in the scheme because the high price of Fairfax stock, the enormously

34

large short position, and the unavailability of shares to purchase made it very difficult to cover without enormous losses.

108.    For his part, having committed to support the short-selling interest of his major hedge fund clients, and with those major clients carrying enormous exposure in an extremely difficult short position to exit, Gwynn was left with no choice but to continue to act as a negative siren on Fairfax no matter how badly events discredited his prior predictions or current events and facts contradicted his relentless drumbeat of false, misleading, and recklessly unfounded reports.

109.    For example, as Fairfax stock was rebounding from $50 to $96 in the spring of 2003, Gwynn issued a report on May 6, 2003 that repeated and reaffirmed his previous misleading and unfounded analysis concerning Fairfax and added the following equally misleading, unfounded, and distorted assertions:

- Fairfax's Northbridge IPO filings failed to disclose its reserving details or asbestos reserves, when in fact Fairfax had always reported the Canadian reserve development tables in the annual report, the reserve development over the last decade had been favorable, and there was no disclosure of asbestos reserves by subsidiaries because they did not have any significant asbestos reserves.

- Fairfax's business strategy of acquiring troubled property and casualty companies was flawed and its prospects weak because of this flawed model when in fact Fairfax had not made a significant acquisition in more than four years and had built an excellent platform for growth by any reasonable measure as evidenced by the first quarter results.

- Gwynn raised unfounded concerns about the ability of Fairfax's Northbridge subsidiary to sustain the level of dividend and interest income achieved in the first quarter without any reasonable basis or honest belief.

- Gwynn intentionally ignored the various elements of the first quarter results that plainly contradicted and warranted revision to his prior extreme predictions of doom.

Gwynn would issue increasingly negative and misleading reports throughout this period of improving financial performance and stock price with a frenzied publication rate far in excess of

35

any other company he covered, including reports issued on May 21, 2003, August, 20, 2003, October 10, 2003, November 26, 2003, February 8, 2005, February 26, 2004, March 12, 2004, August 9, 2004, August 11, 2004, August 20, 2004, August 27, 2004, September 8, 2004, October 5, 2004, October 29, 2004, November 1, 2004, November 3, 2004, and November 24, 2004.

110.    Although Gwynn's relentlessly negative series of reports on Fairfax did not provide the Enterprise with the opportunity to cover at anything other than a substantial loss during 2004, it did nevertheless manage to artificially and dramatically suppress the price of Fairfax stock, which throughout this period traded at a substantial discount to book value as opposed to its peers.

### D.    The Enterprise's Early 2004 Efforts to Limit Their Risk

111.    By the beginning of January 2005, short interest in Fairfax had increased to almost 3 million shares.  Moreover, Fairfax was listed on the SEC's Reg. SHO list from its inception in January 2005 and every day thereafter until a brief hiatus in July 2005.

112.    In February 2005, however, Fairfax announced results for the 2004 fiscal year that further confirmed its financial stabilization and turnaround and continued to erode enormously the doomsday scenario upon which the long-term "Fairfax Project" was based.  Following quarters that year likewise showed financial strength.  The mounting evidence of Fairfax's stabilization and turnaround placed short-selling Enterprise members under immense pressure: Fairfax's strengthening position made it increasingly less likely that it would experience a fatal or near fatal collapse; the Enterprise's fear mongering would become less and less effective; the stock price would go up, and the already extreme difficulty in attempting to cover the huge outstanding short position would become near impossible.

113.     However, given the price levels and lack of share supply, Enterprise members had no viable and attractive exit strategies.  Accordingly, the Enterprise redoubled its efforts to destroy Fairfax's reputation and thereby its ability to operate effectively and thereby generate a sufficiently low stock price and high supply to profitably cover.

### 1.     Gwynn's Continued Support

114.     As always, Gwynn continued his relentless litany of negative reports in support of his clients' enormous short positions, rebroadcasting the Enterprise's standard criticisms, inventing others, and consistently attempting to neutralize the increasing positive news out of Fairfax.  Thus, for example, in response to the 2004 year end results released in February 2005, Gwynn issued a highly negative report stating among other materially inaccurate and unfounded assertions that Fairfax's hurricane losses grew approximately $67 million in the fourth quarter on an after tax basis when in fact losses had increased only approximately $21 million after tax.  Going forward, Gwynn would issue three times more reports on Fairfax from 2005 to 2006 -- all overwhelming negative -- than his average and more than double his next most frequently covered company.

### 2.     The Lawless Contribution

115.     In addition, the Enterprise also used Fitch rating agency analyst Lawless to broadcast their concerns which he did in a highly critical March 2, 2005 report that was materially false, misleading, and recklessly unfounded in numerous respects including, among others, the following:

- The report asserted that underwriting at the core operating facilities was weak, when by any reasonable measure the underwriting was strong as evidenced by combined ratios for these core operations of 97.6%, 97.5%, and 107.6% in 2003, 2004, and 2005 respectively compared to combined ratios in the same years of 100.6%, 106.7%, 138.5% in the overall reinsurance industry and of 101.9%, 100.2%, and 102.5% in the overall commercial lines industry.

37

- The report asserted that Fairfax's various successful efforts to provide liquidity in the prior fiscal year by raising money would leave it without that ability in the current fiscal year when in fact by any reasonable measure Fairfax retained sufficient financial liquidity and flexibility.

- The report criticized the sufficiency of Fairfax's disclosures concerning related party transactions, when Fairfax's public disclosures included separate financial statements and 10-K's for not only the Fairfax holding company but also its Northbridge, C&F, and Odyssey Re subsidiaries each of which included unusually lengthy and detailed disclosures of all material transactions including related party transactions.

- The report asserted that Fairfax's investment gains for the prior fiscal year were inconsistent sources of income, when in fact Fairfax had realized investment gains of $275 in 2004 and had a twenty year average total return of 9.3%.

- The report accused Fairfax of establishing ORC Re Limited in 1998 for the express purpose of facilitating finite reinsurance covers, when in fact, as previously and fully disclosed, it was established to serve as the entity through which Fairfax would provide financing for its US acquisitions, would consolidate its European run off portfolios, and would provide protection for the US subsidiaries upon acquisition (ORC Re did subsequently provide finite reinsurance covers for the benefit of Fairfax group operating companies).

- The report accused Fairfax of using inter-company reinsurance transactions with nSpire Re to inflate dividends to Fairfax by over $500 million, when in fact the reinsurance transactions accounted for none of the dividend to Fairfax. Indeed, those reinsurance transactions resulted in losses to nSpire Re and provided no dividend capacity. Instead, the $500 million dividend was generated by interest nSpire earned on its financing of US acquisitions.

- The report criticized Fairfax for focusing on acquisitions and investments instead of operating the underlying underwriting businesses, when in fact Fairfax's approach to decentralized management of the various operating entities and centralizing investing and strategic planning had resulted in operating company premiums more than doubling in the hard market years of 2002-2004 inclusive while Fairfax produced enormous investment gains.

- The report asserted that Fairfax was more vulnerable to commercial lines price softening and a shifting to higher rated insurers, when in fact Fairfax's core insurance underwriting performance was outstanding and sustained by any reasonable measure, including in areas impacted by hurricanes.

- The report asserted that Fairfax's cost of float was in excess of 15% which reflected cumulative underwriting losses of $4.5 billion, when in fact this calculation improperly included in the cost of float calculation expenses incurred by subsidiary Lindsey Morden that had nothing to do with float cost. Moreover, even if those expenses were properly included in a float costs

calculation then the report improperly and inexplicably excluded the
associated fees earned.

- The report asserted that the company's aggressive debt restructuring and $300
million equity placement reflected a lack of confidence in the operating
companies, when in fact Fairfax had always maintained significant cash at the
holding company and disclosed for decades this paramount policy.
Moreover, as was disclosed, Fairfax raised the $300 million for potential use
in its European run-off and not in any way because of its operating companies.

- The report asserted that Fairfax had not disclosed material information related
to its Swiss Re contract and certain ceded losses in its annual report or in that
of its subsidiaries, when in fact the annual report disclosed in detail precisely
that information and none of subsidiaries were involved in those aspects of the
Swiss Re contract.

- The report asserted that Fairfax inadequately disclosed credit facilities in FFH
Gibraltar and FFHL (Luxembourg) when in fact there were no such facilities.

116.    The Fitch analyst Lawless produced was not only materially false, misleading,

and recklessly unfounded in its affirmative criticisms, it inexplicably omitted from its analysis

numerous highly material positive facts that could only have been ignored if the objective was to

present a highly skewed negative analysis.  For example, Lawless ignored Fairfax's (a) improved

cash flow and liquidity after reducing its debt maturities over the following five years, (b)

reduced funding of future premiums on existing finite reinsurance contracts, (c) reduced risk of

further reserve development, and (d) demonstrated ability to access subsidiary cash in arms-

length transactions.

117.    Indeed, later Fitch reports prepared after Lawless departed noted the materiality of

these positive facts.  Relying on these facts, those reports describe Fairfax's demonstrated

financial flexibility as a key company strength, and expressed confidence that Fairfax retained

such flexibility going forward.  Similarly, those reports acknowledged that Fairfax was

generating strong operating earnings with combined ratios below 100%.  In addition, the reports

praised Fairfax's 2004 debt restructuring as a substantial improvement.  Finally, the reports

acknowledged that Fairfax had turned the corner with a management commitment to underwriting discipline.

118.     In addition to this formal report, Lawless would, going forward, actively participate in the efforts to talk down Fairfax to securities analysts, journalists, and other important constituencies.

### 3.     The Enterprise Seeks to Limit Its Risk

119.     As a result of the further evidence of Fairfax's stabilization and turnaround, and the difficulty the Enterprise was having in the face of that strengthening, Enterprise members began taking steps to minimize their increasing exposure.  Enterprise members with the largest exposure began covering portions of their positions to the extent they could, entering into hedging transactions, and shifting portions of their positions to other less exposed existing Enterprise members or new Enterprise members they recruited for these purposes.  The impact of these efforts appeared plainly in the trading behavior.  On April 29, 2005, the stock price was $130, there were approximately 2.75 million shares sold short, and Fairfax had been on the Reg SHO threshold list every day since its inception.  On July 12, 2005, the stock price was $172, shares sold short declined to approximately 2.2 million shares, and Fairfax was removed from the Reg SHO list for the first time.  By August 4, 2005, the stock price further increased to $179 while the shares sold short interest declined to just above 2 million shares.

120.     During this covering period, Gwynn frantically issued four highly critical reports for the purpose of suppressing the substantial price increase resulting from Fairfax's improving condition and the short-selling "squeeze."  For example, on May 2, 2005, Gwynn issued a report claiming, among other false and misleading things, that Fairfax had enormous reserve deficiencies, unfunded APH, excessive reinsurance recoverable leverage, and excessive finite

reinsurance. In addition, Gwynn claimed that Fairfax's combined ratio for the quarter was almost 115%, which was a figure that was demonstrably untrue under any accepted and faithfully applied combined ratio calculation methodology. Indeed, to arrive at this figure Gwynn, among other things, included in his calculation certain subsidiary expenses that were not relevant to the combined ratio and even then excluded fees earned associated with those expenses.

121. In addition, to further the Enterprise's objective of manufacturing fear about, and actually instigating regulatory and other legal action against, Fairfax, Gwynn commented on Fairfax's recent receipt of an SEC subpoena concerning finite reinsurance with the wild speculation, "I would expect more subpoenas to come," and rationalized this unfounded statement based on the further recklessly false and misleading assertion that Fairfax was involved in "the egregious use of finite reinsurance."

122. In a July 13, 2005 report, Gwynn added to his previous recklessly false and unfounded assertions, the equally false and unfounded assertion that subsidiary Odyssey Re was grossly under-reserved for the periods 1997-2001 based on a generalized industry comparison that did not take into account far more predictive data. Gwynn adopted the least rigorous and informative methodology because he understood it provided the most negative -- and most distorted -- picture of Fairfax. Further evidencing Gwynn's agenda, he also omitted to mention that during the same period, Odyssey Re was one of the few insurers not to increase its exposure, which would have constituted a substantial mitigating factor to the results of his bogus analysis. On August 6, 2005, Gwynn warned "If you are a shareholder of Fairfax, your first question would probably be: Have the true economics of the business been clouded by accounting gimmicks, including finite? There's no doubt in my mind, that Fairfax has done exactly that."

41

E.   **The Renewed Fall 2006 Attack**

1.   **The SEC Subpoenas**

123.   On the morning of September 6, 2005, Bernstein called one of Fairfax's officers seeking comment on the SEC's subpoena to Fairfax concerning finite reinsurance. At the time, Fairfax had received no such subpoena, and Bernstein was so informed. The next day, however, Bernstein's question proved remarkably prescient when Fairfax received an SEC subpoena. Moreover, the short position in Fairfax increased substantially in the lead up to the announced SEC subpoena. On September 15, 2005 Fairfax returned to the Reg SHO list, where it has remained every day since.

2.   **The Bogus October Reports**

124.   On October 7, 2005, the Enterprise through Contogouris, disguised as MI4 Reconnaissance, issued an "FFH Morning Note" to Fairfax shareholders, analysts, rating agencies, and others. The report failed to disclose that it had been prepared and was being disseminated by Contogouris on behalf of a group of short-selling hedge funds for compensation in direct violation of Section 17(b) of the Securities Act of 1933. The report repeated various materially false, misleading, and recklessly unfounded assertions the Enterprise was disseminating about Fairfax including the following:

- "the company's financial position was weak"
- its reported financial numbers were false and inconsistent with its "real" financials
- Fairfax's announced $300 million offering demonstrates it has "'a brazen commitment to self-dealing'"
- "MATERIAL INFORMATION ABOUT THE GROUP'S FINANCES WAS WITHHELD FROM THE 'STREET' AHEAD Of THIS OFFERING"
- Watsa is the only Fairfax board member
- Fairfax's $300 million offering was like the drawing down on revolvers that occurred as part of the Enron fraud

42

- Fairfax raised capital because all its other assets were already pledged or double pledged for loans that were borrowed and moved through off-shore, off-balance sheet vehicles

- Fairfax conducted a private $300 million offering in order to conceal material nonpublic information about the true nature of its pledged assets and "selected" the recipients of the offering based on their likelihood to accept Fairfax's material non-disclosures or because they were selectively informed and thereby were "trading on inside information" because they had "some quid pro quo in hand."

- Major shareholder Southeastern Asset's chief was not a smart investor but "too stubborn to consider objective analysis" as evidence by the fact he "rode Fleming Waste Management in the ground", and "FFH will be yet another example of this."

### 3.    The Stocklemon.com Report

125.     The Enterprise followed up these developments with a report by the internet website Stocklemon.com, which is a regular mouthpiece for short sellers.  On October 21, 2005, Stocklemom.com issued a report entitled "Where There's Smoke There's Fire . . . Could Fairfax Financial Be the Next Refco?????".  Echoing exactly the Enterprise's standard script, the report stated "Stocklemon believes that the current circumstances regarding investigations and claims might be the final blows to Fairfax Financial", referenced the October 10, 2005 Wall Street Journal article in asserting that "[i]nstead of acting professionally and describing the details of the investigation, Fairfax was quick to put out a PR stating only that they did not receive a subpoena from the U.S. Attorney",  and claimed that the "lunacy of these statements was best expressed on this White Collar Crime Blog."

126.     In fact, however, the cited blog said nothing remotely similar to Stocklemon.com's characterization.  Instead, it noted that the Wall Street Journal story alone dropped Fairfax stock over 8% and questioned "How is it that companies find out from the media when they are being investigated as opposed to from the government? And will the media

43

prove correct here?" Likewise, the specific blog section hyper-linked in the Stocklemon.com questioned:

> Are they a *target* of an investigation? Are they a *subject* of an investigation? Or are they just a *witness*? What exactly was Fairfax told? And if they are being investigated, should the government be issuing a target letter? Is Fairfax trying to hide information from its investors, or is this a situation that the government is not being up front with the company? Or is this a situation that the government is trying to pressure the company to provide information and individuals for their investigation? *The government has the ability to place enormous pressures on companies during an investigation. On the other side, the release of information of a pending investigation can be detrimental to a company. Is there a better way of doing things here?*

(emphasis added).

127.    Stocklemon.com also rebroadcast the Enterprise's various unfounded assertions that Fairfax was dangerously illiquid and concealing this fact through fraudulent stock offerings and offshore dealings. In this regard, Stocklemon.com tellingly linked a document the Enterprise had previously prepared concerning purported "similarities" between Fairfax and the fraudulent failed Australian insurance company HIH.

128.    Stocklemon.com likewise rebroadcast the Enterprise's standard attack on Watsa personally. The report asserted falsely that while Warren Buffet "has a successful track record based on high profile investments that have paid out in the long term, Mr. Watsa has kept most of his investments hidden from his shareholders." It cited two press articles as support for this proposition, although neither article actually provided such support. It then compared Mr. Watsa's practices to those "of Enron and Refco." As examples of such Enron-like behavior,

44

the Stocklemon.com report regurgitates the Enterprise's recklessly false and unfounded accusation that Fairfax's Luxembourg subsidiary was being used as a vehicle for fraud.

129.   Stocklemon.com also rebroadcast the Enterprise's recklessly false and unfounded assertions "that Price Waterhouse has not exercised any professional skepticism in the auditing of Fairfax Financial and therefore is negligent in fulfilling SAS no. 99 requiring professional skepticism." The report concludes with a summary of the Enterprise's fear-mongering mantra --

130.   "Where there is smoke, there is fire" and further comparisons to Enron and Refco's conduct.

### 4.   The Stepped-Up Harassment and Pressure of Fairfax Executives and Professionals

131.   At the same time the Enterprise began an aggressive campaign of harassment of Fairfax executives and personnel intended to erode their confidence in Fairfax, intimidate them into providing material non-public information for the Enterprise's trading purposes, and instigate internal e-mail, phone, other insider communications that the Enterprise hoped to gain access to in various ways. By way of example only, the Enterprise engaged in the following assaults on Fairfax insiders:

(i)   On November 9, 2005 a package was delivered by courier to the Mr. Watsa's pastor at St. Paul's Anglican Church in Toronto. The package purported to be from a "P.Fate" with the return address and phone number of Saint Patrick's Roman Catholic Cathedral in New York City. The package contained a letter addressed to Reverend Parker stating:

> Dear Father, The attached documents are being sent to you out of my concern for the Church's finances. I am extremely sensitive to this as a result of losing a dear friend Father Richard Bourgeois, an enlightened Benedictine Priest formally of the Collegio D'Anselmo, which as you may know is the Cardinal College of the Vatican. On September 4, 1999 the fugitive Marty Frankel, who perpetrated a massive fraud on the Catholic Church, was arrested at the Hotel Prem in Germany. Interestingly a review of your most recent "Talk in the Pews" shows Mr. Watsa as the Chairman of the investment

45

committee of the church.  More interestingly are the similarities in the facial features between Mr. Marty Frankel and Mr. Prem Watsa.  While these coincidences are surprising, they do not compare to the similarities between the massive money-laundering schemes perpetuated by Marty Frankel and the massively convoluted paper shuffle created by Mr. Watsa through his public vehicle Fairfax Financial Holdings Ltd. . . . the pattern of activities of Mr. Prem are too similar to the course of conduct of Marty Frankel to be overlooked by a person such as yourself, who is responsible ultimately for the funds of the congregation.  Be aware Father, be skeptical and ask Mr. Watsa to make confession.  God Bless, P.Fate.

Attached to the letter was a 30-page document entitled "Marty Frankel:  Sex, Greed, and $200 million fraud" which detailed Mr. Frankel's enormous insurance fraud and money laundering schemes, his fraud on and exploitation of the Catholic Church, the indictment of an elderly Catholic priest, and sordid details of Frankel's sadomasochistic and group sex and other sensational activities.

(ii)     The same day these same documents delivered to Reverend Parker were e-mailed to Mr. Watsa at his office.  These materials left with Rev. Parker and e-mailed to Mr. Watsa were prepared by Bernstein at Exis's New York office, and sent from those offices in order to undermine Mr. Watsa's reputation for integrity and honesty, generating suspicions about his activities, facilitating the Enterprise's efforts to intimidate insiders -- including Watsa's assistant and others who may see this e-mail -- into providing the Enterprise with material non-public information to use in their trading, distracting Watsa and other high level personnel whose focus was critical to Fairfax's success, and instigating negative press stories comparing Watsa to Frankel in the event he vacated his post as financial advisor for his church.

(iii)     For the same purposes, on November 10, 2005, Contogouris using an alias "Monty Gardener" e-mailed Watsa stating "EX_REFCO CEO BENNETT CHARGED WITH SECURITIES FRAUD , OTHER CHARGES IN 8-COUNT INDICTMENT."

46

(iv)     On November 15, 2005, Bernstein called Watsa's executive assistant asking that she call him to discuss Prem and Fairfax.  When she did not return that call, Contogouris sent another e-mail from his alias "Monty Gardener" again stating "EX_REFCO CEO BENNETT CHARGED WITH SECURITIES FRAUD, OTHERS CHARGED IN 8-COUNT INDICTMENT."

(v)     On December 12, 2005 two Enterprise members appeared at Watsa's home and attempted to question his family about the whereabouts of Watsa and his wife in a threatening manner.

(vi)     On December 14, 2005, an Enterprise member entered Fairfax's offices, dropped off a package for Watsa, and began conspicuously photographing the reception area extensively. The package contained 2 copies of the 2004 nSpire Re Financial Statements and FFHL (Luxembourg) S.a.r.l. audited financial statements for the period December 31, 2003 and the financial statements of the company as of March 12, 2003.  The Luxembourg documents contained a government stamp certifying they were true copies of the originals.  This stamp was dated November 14, 2004 and although the document post-dated the Stocklemon.com's October 21, 2005 report this exact document was added to that website at or about the time it was left for Watsa.

(vii)     On December 14, 2005, the wife of a former Fairfax CFO observed an unidentified man approaching her house from a taxi, but by the time she arrived at the door he had disappeared into the taxi leaving the same documents that had been left for Watsa that day on the doorstep with no envelope.

(viii)     On December 16, 2005, Bernstein sent an e-mail from a Hotmail account to Fairfax's analysts, rating agencies, shareholders, and select sympathetic journalists.  The e-mail

attached a document entitled "Trevor's Travels: The Kingsmead Fraud -- Another Enron-Like, off-balance sheet deception." The document described in a materially false, misleading and recklessly uninformed manner transactions -- described as the "Kingsmead" transactions -- involving assets Fairfax acquired in its 1999 acquisition of TIG. In addition to materially mischaracterizing the nature of these assets and transactions, the document made, among others, the following false and defamatory statements:

- The Kingsmead transactions were a "Fraud", an "Enron style described fraud", "another Enron-like, off-balance sheet deception", "an international fraud perpetrated on U.S. shareholders, which is similar to Enron's supporting of balance sheet vehicles managed by Andy Fastow and his wife."
- This "fraud" was necessary "for Prem's Fairfax holding company, as it is chronically illiquid and basically insolvent" and Watsa engaged in "deceptions" that were "violations of securities laws" and "criminal" conduct so he could use the Odyssey Re subsidiary as his "piggy bank".
- Fairfax failed to disclose liability associated with the Kingsmead assets when in fact Fairfax made numerous disclosures of this liability in its 2001 Annual Report.

      \*                     \*                     \*

Bernstein prepared and sent this document as part of his financial relationship with the hedge fund Enterprise members and did not disclose this relationship in the documents in violation of, among other things, 17(b) of the Securities Act of 1933 and Rule 10b-5.

(ix)     On December 16, 2005, Watsa received an e-mail from a "Robert Rafelson" stating "Hey, Prem are you using the shareholder's money to fuel the corporate jet for your family's personal use? I hope not. Love, Rob." This e-mail was sent by Bernstein from Exis's New York office.

(x)     On December 18, 2005, Enterprise operatives were parked outside Mr. Watsa's house and followed him when he drove away.

(xi)     On December 19, 2005, Watsa's executive assistant received two e-mails directly from "Dick Tracy" attaching a document that was addressed to her at "'Fairfax Financial' or Whatever It Is Today" and threatened her with the consequences of being involved in criminal behavior:

> The attached documents are being sent to you out of concern for your unwitting participation in possibly very serious federal crimes committed by Mr. Prem Watsa.
>
> On September 4, 1999, the fugitive Marty Frankel, who had perpetrated a massive fraud on many people close to him, including the Catholic Church, was arrested at the Hotel Prem in Germany. First look appears to have a clear connection to Mr. Watsa, if only by name. Interestingly, a closer look at a picture of Mr. Prem Watsa's facial features, photo comparison attached herein, shows some disturbingly haunting similarities between Prem and Marty. No doubt you are aware that Prem wears glasses of similar shape and size that rest askew on the bridge of his nose like Marty's. . . .[2]
>
> While these coincidences are surprising, they do not compare to the similarities between the massive money-laundering schemes perpetrated by Marty and the massively convoluted paper shuffle created by Prem through his public vehicle Fairfax Financial Holdings Ltd. One has to ask how this unbelievably meteoric rise of this roll up of garbage insurance companies could happen without Prem's close team working together to create and maintain a course of conduct that is in fact, a premeditated and sustained deception of investors. Although one could say over the last year, many close associates of Mr. Watsa have been sufficiently worried about his behavior and seem to be dropping off the Fairfax map at a rate that only an insurmountable contradiction [sic] of the Ebola virus singling out Prem's people could explain otherwise.
>
> Please understand that this behavior will not stand. This pattern of deception that Prem practices is too similar to that of Marty Frankel to be overlooked. A person such as you has a lot to lose. No doubt you are aware that those that don't help Prem end up leaving after years of service with the severance afforded those that work at Burger King drive thru. Be aware Ms. [name omitted] he will be held accountable. Prem is not above the law.
>
> Halleluiah!

The letter attached the same thirty-page expose on Mr. Frankel entitled "Sex, Greed and $200 million Fraud."

---

[2]     The letter includes a picture of a bedraggled fugitive Frankel and not remotely similar picture of Watsa.

(xii)    On the same day, Watsa's assistant received another e-mail from "Dick Tracey" with a re line "PERSONAL USE OF THE FAIRFAX COMPANY CORPORATE JET BY PREM WATSA AND FAMILY" that stated :

> The attached documents are being sent to you out of concern for your unwitting participation in possibly very serious federal crimes committed by Mr. Prem Watsa. Recent Press of Conrad Black (another Canadian of dubious reputation) suggests, based on allegations of the U.S. Government, that he did not respect third party shareholder's money for which he was not the custodian. I think that you should be particularly sensitive to issues that regard Mr. Watsa and his family's personal use of the Company's jet. Operating under the assumption that as Prem's personal secretary you make the arrangements to schedule the plane for use and in fact probably have the tail number memorized, you should note the U.S. Attorney's frowning upon Mr. Black using shareholder money to fuel the company jet for personal use is quite serious. You see Ms. [name omitted], you work for the shareholders of the Company that own the plane. All of them, and not for Mr. Watsa. And as of today it can't be confirmed for sure if Mr. Watsa is even one of them, or if he has pledged, lost or squandered any holdings he may have. Therefore, it is incumbent upon you to double check any direction Mr. Watsa or his family members give you with respect to the plane's use. U.S. Attorney Mr. Fitzpatrick may want to know. See the Conrad Black press of November 18[th] below.
>
> In particular Ms. [name omitted], please keep you [sic] antenna up to spot any move Mr. Watsa in directing the jet to fly him and his family to India to escape prosecution. You would likely have knowledge of such an event and could be held responsible as a co-conspirator in arranging Mr. Watsa's fleeing of the country.
>
> Fly Straight Ms. [name omitted]!

The e-mail attached documents regarding Marty Frankel's use of the corporate jet and was prepared and sent by Bernstein at Exis who attempted to cleanse the e-mail and attachment of all electronic identifying information because he understood his conduct to be improper.

(xiii)    When Watsa's assistant did not respond to the various e-mails she had received, on December 21, 2005 Bernstein resent the two "Dick Tracey" e-mails with the same message and attachments. On December 29 and 30, 2005, after receiving no response from Watsa's assistant, Bernstein re-sent the same two e-mails and attachments to her again.

(xiv)    On December 28, 2005, Bernstein sent a document to Fairfax's shareholders, analysts, rating agencies, and sympathetic members of the media that made materially false,

50

misleading, and recklessly unfounded assertions concerning an inter-company share transfer of Odyssey Re stock. The document cites and echoes the recent Reality Check article. Among other things, the document made the following materially false, misleading, and recklessly unfounded statements:

- Watsa was attempting to "prop" up Odyssey Re shares and "mov[ing] them from subsidiary to subsidiary (or related company) to keep the waters muddy" and thereby conceal an underlying money drain;

- "all of ORH shares and everything FFH owns in the United States had been hocked"

- "Using the undisclosed vehicle, FFHL (Luxembourg) S.a.r.l., all the assets of the Fairfax (Gibraltar) Ltd., by extension Fairfax Inc., and by further extension Odyssey Re and subsidiaries are pledged"

- Bermuda and offshore reinsurance subsidiaries, CRC Bermuda and Wentworth, "were being used for purposes to "hide" transactions"

- CRC Bermuda and Wentworth were using $600M in losses ceded to them by Northbridge to fund European Runoff losses in a manner concealed from insurance regulators using the Luxembourg subsidiary in a "robbing from Peter to pay Paul" scheme concealed by Watsa.

- That this "scam" was being used to also "perpetuate the illusion of a 'transfer of risk' on third party reinsurance transactions like Swiss Re."

(xv)    On December 30, 2005, Contogouris created three identical websites www.premwatsa.com, www.premwatsa.net, and www.Premwatsa.co.uk with a homepage consisting of the image of a shredded piece of paper containing an Enron logo altered from an "E" to an "F" with the word "Fairfax" substituted for "Enron." On the bottom of the shredded paper appeared the title of the best-selling book on the Enron scandal "The smartest guys in the room." In front of the shredded piece of paper was a distorted photo of Watsa and other Fairfax executives under which appeared the words "Come see where all your money went." On another page there was a picture of Watsa, the same altered symbol, and a map of Bermuda under which the words "coming soon . . ." were appended.

51

The websites were then used to disseminate misleading reports and disparaging accusations concerning Watsa, including his alleged involvement in criminal and unethical behavior.

(xvi)     Between February 14-16, 2006, Fairfax's website experienced six separate cyber-attacks attempting to hack into the Fairfax server using the same internet service provider as various Enterprise members. Moreover, throughout February, Enterprise members including Bernstein and Contogouris aggressively pursued existing and former Fairfax executives in a desperate effort to develop some information upon which to support their recklessly inaccurate misinformation and theories.

(xvii)   In early March, the Enterprise again began disseminating material misinformation and baseless accusations to Fairfax's auditors, and threatening those auditors with legal action. For example, on March 2, 2006, an e-mail from Bernstein's alias "Robert Rafael" was received by PwC auditors stating as follows:

> I understand you are looking at restatements of Fairfax Financial Holdings. Please be advised that it appears that the attached documents show that your firm knew of a MATERIAL inflation in the financial statements of FFHL (Luxembourg) S.a.r.l. one day before a crucial audit which was used to certify assets that were being pledged for a loan in 2004. To the extent that short sellers have suffered damages in the cost to borrow shares of Fairfax that have been supported by these materially false financial statements produced by your firm, you may be held liable. It is incumbent on you to reexamine the whole chain of transactions at every off-shore shell company subsidiary as it appears likely that Fairfax has inflated their assets. Please see the attached documents.

The e-mail from Bernstein attached the Luxembourg filings the Enterprise had been peddling to shareholders, analysts, rating agencies, and journalists and arranged to have posted on the Stocklemon.com website. Bernstein sent a second e-mail to Fairfax's auditors under the false identity "Robert Rafelson" on March 6, 2006.

52

(xviii)   On March 9, 2006, the General Counsel of one of Fairfax's European subsidiaries informed Fairfax that she had received an eerie e-mail from a Spyromi4@aim.com stating "I am reading about you in the Lawer [sic] News and am stunned by the fact that you are posing next to the largest nose I have ever seen. Being so close to such a nose, one would think the sense of smell would rub off on you. In particular can you smell the very serious negative issues that are facing runoff for Fairfax. Issues which, you seem to have glossed over when meeting with Miss Helen Morris for your article. In fact runoff doesn't seem to be going well at all. Correct?" The e-mail concluded with the ominous "I will be seeing you soon [name omitted]."

(xix)   Between March 10-16, 2006, the CFOs of Fairfax and its largest subsidiaries received unidentified e-mails from Spyromi4@aim.com; Bernstein called Watsa's assistant to inform her that they knew Mr. Watsa's out of office whereabouts and itineraries; anonymous questions addressed to Watsa and Fairfax CFO Taylor were dropped off at their Odyssey Re subsidiary; and audio clips from Harry Potter and a George Bush speech were left on Watsa's home telephone message machine and the office voicemail of Fairfax's CFO.

**F.   The Enterprise's Current Attempts to "Bring Down Fairfax"**

132.   Although the Enterprise's efforts were having a material adverse impact on Fairfax, as evidenced by, among other things, the erosion in its stock price from $153 on February 1, 2006 to $133 on April 3, 2006, the impact fell far short of the Enterprise's expectations and, more importantly, far short of what the short-selling Enterprise members needed to cover their short sale without suffering severe losses, let alone reaping the type of profit for which they had been waiting a long time. The Enterprise members understood they required far more convincing and damning material to hope to achieve their goal of "bringing

53

down Fairfax" so they could avoid staggering losses and make this investment profitable. Accordingly, the Enterprise members agreed to an ever more bold and aggressive attack against Fairfax, which they planned to successfully complete by July.

133.    The Enterprise's revised plan to "bring down Fairfax" was to coordinate (a) a drastic downward manipulation of the price of Fairfax stock through various bogus trading activities; (b) a blitz of wildly alarming rumors of Fairfax's imminent demise; (c) ominous questions to major shareholders from a business reporter working with the Enterprise; and (d) a series of negative articles echoing and endorsing the various theories the Enterprise had developed.  The plummeting share price, wild rumors, unnerving journalist questions, and bad publicity were intended to panic major shareholders into selling their shares and thereby causing the stock to plummet on a volume sufficient for the Enterprise to cover as much of its short position as it desired before a final push to destroy the company.

134.    Thus, Enterprise members, including Exis, Sender, Heller, Contogouris, Bernstein and Lawless, ratcheted up their communications with shareholders and analysts, to whom they continued to assert that Fairfax was a fraud like Enron, Refco, and various other known corporate frauds.  They also undertook to find another business publication that would be willing to run stories rebroadcasting the theories that had been developed but had failed to get any publications to credibly consider and write about.

**1.    The Renewed Effort to Develop Convincing Theories**

135.    Realizing that their dated and factually unfounded bag of defamatory accusations were now insufficient, Enterprise renewed their efforts to extract non-public insider information from which they hoped they could spin in ways damaging to Fairfax.  For example, on May 31, 2006, Contogouris lied his way past security at Fairfax's RiverStone subsidiary in London,

saying he was a reporter conducting a survey who wanted to leave a card at RiverStone reception. Once in, however, Contogouris handed out a card identifying himself as "Special Situations Research Consultant" with "MI4 Reconnaissance" based in New York. The address on the card was that of his apartment in New York City and the phone number was that of Exis. Contogouris falsely informed these executives that Watsa had sold Fairfax's interest in RiverStone and that their company was no longer a subsidiary of Fairfax in an effort to coerce them to talk. When pressed to back up this statement, Contogouris made a call to his New Orleans attorney and to Lawless (who had since left CFRA to work exclusively for the Enterprise). Nevertheless, Contogouris returned unable to substantiate his false statements and abruptly left.

136.    The next day, June 1, 2006, Contogouris hand-delivered an unmarked manila folder addressed to Fairfax's former CFO Trevor Ambridge (who in fact remained an officer of Fairfax) at the offices of his new employer, Fairfax subsidiary Advent. The envelope contained a letter on "MI4 Reconnaissance" letterhead attempting to induce Mr. Ambridge into providing material non-public information to Contogouris by threat and promise. The letter states in part:

> I will try to make this the most respectful letter I can under the circumstances. No doubt you are aware that these are very critical times for your former employer Fairfax Financial Holdings, Ltd. So I want this to be "fair and friendly" . . . . In this spirit, I am available to meet with you in London at your earliest convenience. I would like to lay out a series of maps, flow charts and related exhibits which I have put together that I feel are missing some critical pieces

137.    To secure Ambridge's help, Contogouris would offer the explicit and veiled threat that failure to cooperate would result in Ambridge's criminal prosecution:

> Take just a minute, sit back and try to view what the world will look like for Fairfax and its former officers three years from now given the current level of regulatory scrutiny. Look to the lessons of Enron and most recently of Escala Group (NASDAQ:ESL; I have attached the information at the end of this letter for your reference). . . . I can help by introducing you to a former high-ranking investigator for the U.S. Government who

could act as a confidential liaison with current regulators on your behalf to set the record straight and get to the bottom of this. . . . I indulge your attention to a recent witness in the Enron trial testifying that a certain research report led a high ranking executive to say aloud, "they're on to us!" I cannot help to speculate that a similar thought process may have played some part in your decision to move to London. . . . Please help me fill in the blanks. . . . I can be in London at your convenience over the next several weeks with all of my materials. . . . I will arrive with the aforementioned former Government person who can speak to you with the highest degree of confidentiality."[3]

The letter was signed "Spyro" and indicated in a post-script that he could be reached at

"spyromi4@aim.com."

138.     At the direction of Fairfax's counsel and security/investigative personnel,

Ambridge responded two weeks later indicating he would be willing to discuss the proposal

provided Contogouris committed to not contacting him at work because it could jeopardize his

new job.  Contogouris agreed to only communicate with Ambridge through his personal e-mail.

In addition, Contogouris again made clear that, by cooperating with Contogouris, Ambridge

might be able to avoid a criminal prosecution: "We should meet privately and discuss.  I cannot

guarantee you immunity.  However, I can say with some level of confidence that I can introduce

you to certain relationships that I have for you to talk to that I can guarantee attorney client

privilege confidentiality and that would negotiate a 'queen for a day' (what you say won't be

held against you) with the Department of Justice."

139.     Contogouris played up the danger and Ambridge's exposure if he did not

cooperate in a follow-up e-mail indicating that he intended to:

bring a Former Special Agent of the Secret Service and FBI . . . uniquely qualified to communicate to you a depiction of how the government works, as well as, give you a clear perception of the magnitude of the investigation and how your association with Watsa may have made you culpable.  Furthermore, he can explain to you how different intelligence entities are involved in this case and explain the vulnerability of current and

---

[3]      The document to which Contogouris refers is MI4 report on Escala that Contogouris was paid to distribute just as he was the reports he issues on Fairfax and the report likewise nowhere disclosed the financial relationship between Contogouris and the short-selling hedge funds he was promoting by distributing the report in violation of Section 17(b) of the Securities Act of 1933.

former officers and directors of Fairfax. In addition, he could explain how your cooperation could possibly lead to immunity from prosecution by putting you in touch with appropriate authorities. Believe me when I tell you it is my best interest to try to insulate you from prosecution. His experience has been that the person who is first to cooperate usually gets the best deal and gets it put behind him or her.

140.    Contogouris then sent Ambridge an e-mail from "Martin Gardener" to which he requested all future communications be directed. When asked why, he explained the alias was a means whereby he might be able to frustrate subpoenas served on him and avoid having to give truthful testimony concerning his activities: "I do not stay in hotels under any Christian name when meeting insiders at companies. You can use your imagination why. Clearly it leaves my options open in telling my story in the event I am ever subpoenaed. Capisce?"

141.    Contogouris also explained that "What I do for a living is provide highly valuable information to a small group of investment clients" and would "show you why . . . that if authorities go after Prem that certainly he will make you the fall guy. And as such you may want to get the jump on him and consider possible actions and defenses first as I am sure he is the architect of the deceptive dissemination of information" and "had violated U.S. Securities laws." Contogouris again stressed that, in exchange for information from Ambridge, Contogouris would make his former government agent available to help insulate him from prosecution.

142.    An initial meeting was scheduled but then cancelled by Contogouris because of a claimed family crisis. When Ambridge attempted to reschedule the next meeting, Contogouris pressed aggressively to proceed because the Enterprise by that time had elected to work with a New York business reporter who the Enterprise had convinced to do a series of "investigative pieces" that the Enterprise believed would resurrect and revitalize the tired and unfounded theories other publications had up to that time declined to write about. In order to force Ambridge to meet in time for Contogouris to feed this information to the reporter, Contogouris

57

threatened him by accusing him of being involved in a "criminal fraud", reminding him to "just think what I could do with all your emails," calling his office directly, stating that he intended to "consider all my options as maintaining our confidentiality," threatening that if Ambridge did not immediately cooperate he could "no longer rely on my discretion," should expect to begin receiving e-mails directly at his office, and "will regret it later." When Ambridge objected to such threats, Contogouris told him "you are done" unless he immediately rescheduled. When Ambridge did not respond, Contogouris sent him an e-mail directly to his office from MI4 Reconnaissance that revealed the e-mail name Ambridge had used in their private exchanges with the message "RUN RABBIT Run . . . Check your email George and get back to me."

### 2. The Enterprise Attempts to Orchestrate Negative Press

143. Simultaneously with these events, Fairfax began receiving calls from the New York reporter with whom members of the Enterprise were communicating regarding the "series of investigative stories" he was pursuing. That reporter began asking questions about exactly the issues -- and often using virtually exactly the same language -- that the Enterprise had been attempting to develop information on, confronting insiders about, and unsuccessfully attempting to get stories written about. In addition, insiders who received calls from enterprise members attempting unsuccessfully to obtain material inside information were on several occasions contacted almost immediately thereafter by this reporter.

### 3. The Enterprise June Attempt to Exit

144. Consistent with its plan, the Enterprise in concert with various trading and broker providers began to manipulate the price of Fairfax stock down in the second half of June through a series of manipulative trading techniques. At the same time, they flooded the market with rumors that Watsa had placed his assets in his wife's name and fled the country, Fairfax

58

subsidiaries were missing cash, the Royal Canadian Mounted Police were about to raid Fairfax's offices, major shareholders were looking to sell their shares, Fairfax had scheduled and then cancelled an investor call about the SEC investigation, Fairfax had attempted a bond offering that failed, and Fairfax had attempted a $300 million equity offering that had failed.

145.     These rumors were so intense that major shareholders, trading desks, brokerage houses, rating agencies, and analysts all made alarmed calls to Fairfax seeking answers. Goldman Sachs called Fairfax's bond portfolio managers throughout the day of June 23, 2006, to report that these rumors were causing the value of Fairfax's bonds to collapse.  Fairfax's stock likewise plummeted to nearly $90 per share.

146.     However, the Enterprise's efforts failed to shake loose the major shareholders and thereby provide the genuine selling pressure and liquidity to allow the Enterprise to cover its enormous short position.  As a result, the Enterprise was forced to regroup for another attempt that it would hope to base on the expected series of tabloid pieces, inside information, and instigated regulatory action.

G.     **Damages**

147.     The Enterprise's scheme inflicted enormous damage on Fairfax's reputation, business, employees, and investors.  The scheme's unrelenting campaign of negative misinformation devastated the market reputation of Fairfax and its affiliated operating companies, as well as the business relationships critical to its operation and strategic plans.  For example, the attack on Fairfax caused its operating companies to suffer downgrades by its rating agencies, with a concomitant decrease in business.  The misinformation disseminated by Enterprise members about Fairfax's accounting and business practices devastated Fairfax's reputation among, and relationship with, the customers, agents, regulators, and business partners critical to the success of Fairfax's growth -- and survival -- as a major property and casualty